**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

VALERIE ALBRO,                                    CIVIL DIVISION

       Plaintiff,                                 No.

   v.

ST. JOSEPH INSTITUTE, LLC d/b/a ST.
JOSEPH INSTITUTE FOR ADDICTION,

       Defendant.                                 **JURY TRIAL DEMANDED**

## COMPLAINT

AND NOW, comes Plaintiff Valerie Albro by and through counsel Robert A. Bracken, Esquire and Bracken Law Firm, LLC and files the following Complaint and avers as follows:

### PARTIES AND JURISDICTION

1. Plaintiff, Valerie Albro, is a resident of the Commonwealth of Pennsylvania, with an address of 105 Patricia Lane, Pleasant Gap, PA 16823. Plaintiff was an employee of Defendant.

2. Defendant, St. Joseph Institute, LLC ("SJI") is a limited liability doing business as St. Joseph Institute for Addiction with its principal place of business located at 134 Jacobs Way, Port Matilda, PA 16870.

3. Plaintiff brings this action under 42 U.S.C. § 1981, and Title VII, 42 U.S. Code § 2000e, to secure all relief as may be appropriate and available.

4. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The filing also constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work

sharing agreement between the EEOC and that agency.  At the appropriate time, Plaintiff will amend this Complaint to assert claims under the Pennsylvania Human Relations Act.

5.    Plaintiff was issued a Notice of Right to Sue from the EEOC, which was sent to Plaintiff on December 16, 2022. A copy of the Notice is attached as Exhibit 1.

6.    The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

7.    Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Centre County, Pennsylvania.

## FACTUAL ALLEGATIONS

8.    Plaintiff was employed by SJI as a counselor from October 20, 2016 until she was terminated on September 28, 2021.

9.    Plaintiff is a Black woman and was the only Black employee for most of her career at SJI.

10.    At times, Plaintiff was one of two Black employees at SJI.

11.    Throughout her employment, Plaintiff experienced and witnessed racist, discriminatory conduct.

12.    When she reported it, Plaintiff was retaliated against by SJI and a summary of the conduct that she experienced follows.

13.    On 3/18/17, Plaintiff was called the "N" word by a client.

14.    When Plaintiff spoke to former Clinical Director Torrie Headley in regards to her feelings about this incident, Ms. Headley told her to not take it personal and stated, "I've been called a cunt before."

15.    Plaintiff became more upset and told her that was not the same thing.

2

16. On 5/4/17, Plaintiff turned 49 years old and as she was getting her lunch, the CEO at the time Brian Stoesz said, "WOW! Black don't crack."

17. On 7/25/18, a White client called a Black client the "N" word.

18. When Plaintiff tried to advocate for the client who had been called the racist slur, Plaintiff was shut down and SJI covered up the incident.

19. The Black client was discharged days later on August 2, 2018.

20. On 8/2/18, which was a few days after Plaintiff attempted to advocate for that client and the day that he was discharged, Plaintiff received an employee corrective action report.

21. Plaintiff was accused of leaving work early to get her hair and nails done.

22. Plaintiff stated that she had never left early to get her hair or nails done and told Tammy Sipes, Business Office Manager, that she felt that she was being discriminated against.

23. In response, Ms. Sipes stated, "this conversation was over."

24. This matter was never investigated despite Plaintiff's request for an investigation.

25. On 8/17/18, while exchanging messages with Max Spiegel, Vice President of Digital Strategies, Plaintiff sent him a "thumbs up" emoji.

26. In response, Mr. Spiegel wrote: "Is that a black hand thumbs up?  Oh wow, they have all kinds of shades.  But you didn't use the darkest one?  What a wild world.  Have a great weekend."

27. On 10/30/18, as Plaintiff was walking out of the bathroom, Executive Director Guy Murray was walking through the Wellness Center.

28. Plaintiff was dressed in black clothing.

29. Mr. Murray looked at Plaintiff and stated, "You look like a maid about to go clean something."

3

30.     On 11/15/18, Plaintiff had a conversation with former Clinical Director Valerie Liptak who told her in confidence that, among other things, Mr. Murray wanted to fire Plaintiff because Plaintiff was "loud and aggressive."

31.     Throughout her employment, SJI stereotyped Plaintiff as an "angry Black woman."

32.     On 12/8/18, Plaintiff was advised by a counselor named Emily that she was told by Mr. Murray and the new Clinical Director Kelli Corl to assign a client to Plaintiff because of the color of their skin.

33.     On 12/11/18, Plaintiff received an employee corrective action report falsely accusing her of swearing at a client.

34.     Plaintiff denied this accusation and asked for the matter to be investigated.

35.     In response, Ms. Sipes stated that she would not investigate and believed the complaint.

36.     Plaintiff asked Ms. Sipes why she would believe hearsay and she responded, "the way you carry yourself."

37.     Plaintiff asked Ms. Sipes what she meant by that and she stated that Plaintiff was "loud and aggressive."

38.     After leaving Ms. Sipes' office, Plaintiff spoke to Mr. Murray and explained the conversation she had with Ms. Sipes.

39.     Mr. Murray informed Plaintiff that the report came from nursing that Plaintiff was swearing at the client.

40.     Plaintiff explained that the incident did not occur and asked how would the nurse have heard her cursing if it was only the client and Plaintiff in Plaintiff's office.

4

41.   Mr. Murray informed Plaintiff that he would investigate the allegations but never did.

42.   To maintain professionalism, Plaintiff only had contact with that nurse when necessary.

43.   However, prior to the nurse who made the allegation quitting SJI, she reached out to Plaintiff and asked if she could speak with her.

44.   That nurse told Plaintiff: "I want you to know I was forced to write a statement on you."

45.   On 1/18/19, Plaintiff received a call from Ms. Sipes.

46.   Ms. Sipes falsely accused Plaintiff of not talking to a business developer (marketer) in regards to a client.

47.   Plaintiff explained to Ms. Sipes that she had spoken to the business developer.

48.   Ms. Sipes responded that she did not believe Plaintiff.

49.   Plaintiff told her she had proof and forwarded her the email conversations.

50.   Despite being proven wrong and falsely accusing Plaintiff, Ms. Sipes never apologized.

51.   On 1/31/19, Ms. Sipes was in the role of acting CEO/Clinical Director.

52.   Due to the weather, Counselor Mark R. and Plaintiff came up with an idea for the client group, but needed to get approval from Ms. Sipes.

53.   Therefore, Plaintiff called Ms. Sipes and counselor Mark R. and RA Jeremey R. were present.

54.   Ms. Sipes was informed she was on speaker and Plaintiff asked for her approval to watch a movie (The Shack) and then process it with the clients.

55.    Ms. Sipes reported that she had read part of the book, but did not like it.

56.    She bluntly said "my God is not a Black woman."

57.    Plaintiff said, "Wow! Plaintiff did not ask you that Tammy."

58.    Everyone was shocked by her statement.

59.    When speaking about Black people, Ms. Sipes would, at times, say "you people" or "them people."

60.    On 2/5/19, Plaintiff was at lunch and Ms. Sipes asked why Plaintiff's hair has so many lengths.

61.    She then asked how long Plaintiff's hair was and touched Plaintiff's hair, which was offensive.

62.    On 2/13/19, Plaintiff had another new hair style and Ms. Sipes asked Plaintiff if that was Plaintiff's real hair.

63.    This was also offensive and embarrassing to Plaintiff as a Black woman.

64.    On 11/9/20, Plaintiff received an employee corrective action from the new Clinical Director Brittany Brown, which falsely accused Plaintiff of showing favoritism to a client.

65.    Business developers often provide counselors with pens, highlighters, back packs, cups, etc. and counselors often give the clients some of the items.

66.    Plaintiff had a client who was leaving in a few days and came in with no luggage or bags.

67.    During a small group, after playing addiction bingo, the client stated he did not have a bag to pack his items and asked if he could have the bag.

68.    Plaintiff gave him the bag to pack his belongings.

69.    That same day, another counselor (who is a White woman) gave her client the same bag she had received.

70.    Yet, she was not written up and nothing was even said to her.

71.    When Plaintiff pointed out the disparate treatment to Ms. Brown, she said that "I needed to worry about myself and not focus on others."

72.    Plaintiff then met with the CEO Cindi Coffman a few days later to discuss this matter and was told the same thing.

73.    In March 2021, Ms. Brown and Plaintiff had a discussion with respect to her behaviors towards Plaintiff and Black male clients.

74.    There had been a situation where a Black male client and an older White female client were having a consensual, intimate relationship.

75.    Ms. Brown called the Black male a predator while consoling the White woman.

76.    The Black male was discharged, but the White woman was allowed to stay.

77.    Plaintiff pointed out that this was a consensual relationship, but she did not want to hear any part of what Plaintiff was trying to say and told Plaintiff to table it.

78.    After the meeting, Plaintiff asked to speak with her on culture sensitivity issues and pointed out that both clients were in the wrong.

79.    During this conversation, Plaintiff accused Ms. Brown of being racist due to her treatment towards African American males and herself.

80.    Ms. Brown told Plaintiff she was not racist and stated "I dated a black man before."

81.    Plaintiff spoke with Ms. Coffman and complained that Ms. Brown was creating a discriminatory and hostile environment.

82.     Plaintiff also asked Ms. Coffman to act as Plaintiff's direct supervisor rather than Ms. Brown, but she refused.

83.     On 3/23/21, Plaintiff met with Ms. Coffman, Diana Hoffman, Regional HR representative and Ms. Sipes to discuss the situation involving Ms. Brown.

84.     There was an investigation this time regarding Plaintiff's complaints of racist, discriminatory conduct.

85.     Plaintiff once again asked Ms. Coffman to act as Plaintiff's direct supervisor; she said no.

86.     A few weeks later, Plaintiff met with Ms. Coffman and Ms. Sipes and was told that per their investigation, Plaintiff's concerns were unfounded.

87.     On 4/7/21, Plaintiff received a corrective action after raising concerns that another counselor had falsely told an RA named Crystal Diehl to tell their client that she had left for the day and planned to let the client "walk."

88.     That counselor, a White woman, was not reprimanded.

89.     When providing Plaintiff with the corrective action, Ms. Sipes accused Plaintiff of creating a hostile work environment.

90.     This was just weeks after Plaintiff raised concerns that Ms. Brown had created a discriminatory, hostile work environment.

91.     On or about 4/14/21, Plaintiff was teaching a group when a client was upset due to a counselor calling him out about his behavior.

92.     The client approached Plaintiff, got in Plaintiff's face and stated: "If you were a man, I would knock you the 'F' out."

93.    When Plaintiff reported the incident and explained that she did not feel safe around the client, nothing was done.

94.    The client should have been immediately administratively discharged for threatening staff.

95.    Instead, a meeting was called for all clinical staff and Plaintiff was forced to meet with the client to discuss the events that had happened.

96.    The client apologized and was allowed to stay in treatment.

97.    On 5/26/21, Plaintiff was called to Ms. Coffman's office and Ms. Sipes stated that Plaintiff was loud and making it a hostile environment for others to work in.

98.    Plaintiff disagreed and informed Ms. Sipes that Plaintiff felt like she was working in a hostile environment and being harassed.

99.    Ms. Coffman and Ms. Sipes stated that they were not writing this one up.

100.    Plaintiff reiterated that she felt targeted.

101.    On or about 9/14/21, Plaintiff received a positive annual review and a raise.

102.    Plaintiff was regularly assigned the most clients, which is an issue that Plaintiff raised on several occasions.

103.    On or about 9/17/21, a Latino client threw papers and snatched things off a White counselor's door as well as called her names.

104.    This counselor made it very clear she did not feel comfortable or safe around the client, so the decision was made immediately that he would be an administrative discharge.

105.    Plaintiff asked Ms. Brown if she could speak to the client.

106.    Ms. Brown stated that the decision would not change, but Plaintiff was allowed to speak with him.

107. After speaking with the Latino client who was visibly upset and begged to stay in treatment, Plaintiff spoke with Ms. Brown to ask if they could give him a chance as he had nowhere to go.

108. Plaintiff told Ms. Brown that she would be willing to work with him.

109. Ms. Brown interjected that the White counselor did not feel safe around him, so he was being discharged.

110. Plaintiff then raised the disparate treatment, as when Plaintiff was threatened by a Client, the Client was not discharged despite Plaintiff's request.

111. Plaintiff wanted to know why the White counselor's feelings were more important than Plaintiff's concerns.

112. Ms. Brown became agitated when Plaintiff pointed out that Plaintiff was being treated differently because of her race.

113. On 9/23/21, there was a staff meeting during which client reviews were discussed.

114. Plaintiff had several positive reviews.

115. Following the meeting, Ms. Coffman expressed that Plaintiff was doing a great job and making a difference in the lives of those that SJI served.

116. On 9/28/21, Plaintiff was summoned to Ms. Coffman's office and Ms. Brown and Ms. Sipes were also present.

117. Ms. Sipes stated that Plaintiff was terminated effective immediately.

118. Ms. Sipes stated that Plaintiff was being fired for creating a hostile work environment and being aggressive.

119. Plaintiff responded by pointing that Ms. Sipes had created a hostile work environment for years and the ways in which Plaintiff was treated differently.

120.   Plaintiff asked Ms. Coffman if she was okay with this decision and she responded: "we have to let you go."

121.   Plaintiff was subjected to a hostile work environment and Plaintiff's termination was discriminatory and retaliatory in violation of Title VII and the PHRA.

### COUNT I - RACE DISCRIMINATION

122.   Plaintiff incorporates by reference herein Paragraphs 1 through 121 of the Complaint as if more fully set forth at length herein.

123.   Defendant's conduct described above and herein constitutes race discrimination and is a violation of Title VII and 42 U.S.C. § 1981.

124.   Defendant's discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

125.   The conduct described above and herein was unlawful race discrimination committed by Defendant's employees, servants and/or agents who had the effective ability to influence employment actions that could affect and did affect Plaintiff.

126.   As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

127.   As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems including but not limited emotional distress and anxiety.

128.   As a result of Defendant's discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII and 42 U.S.C. § 1981, including but not limited to

damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement, and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, Plaintiff demands all available damages against Defendant plus interest, attorney's fees, costs, punitive damages and any other damages deemed proper.

## COUNT II - UNLAWFUL RETALIATION

129.    Plaintiff incorporates by reference herein Paragraphs 1 through 128 of the Complaint as if more fully set forth at length herein.

130.    Defendant's conduct described above and herein constitutes retaliation, in violation of the law.

131.    Specifically, Defendant's retaliatory conduct violates all statutes and laws under which Plaintiff has brought claims.

132.    As a direct and proximate result of Defendant's unlawful, willful, deliberate retaliation against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, adverse effects on her career and diminished earning capacity.

133.    As a result of Defendant's retaliatory conduct, Plaintiff is entitled to all damages available under the respective statutes, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement, and promotion; (4) attorneys' fees and costs; and (5) punitive or liquidated damages.

WHEREFORE, Plaintiff demands all available damages against Defendant plus interest, attorney's fees, costs, punitive damages and any other damages deemed proper.

12

## PENNSYLVANIA HUMAN RELATIONS ACT

134.    Plaintiff incorporates by reference herein Paragraphs 1 through 133 of the Complaint as if more fully set forth at length herein.

135.    Plaintiff intends to assert an additional cause of action.

136.    Plaintiff will request leave to amend to bring a cause of action under the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. against Defendant to secure full restitution of all wages and benefits resulting from their violations of the Pennsylvania Human Relations Act and for such other and further relief as may be appropriate upon the exhaustion of administrative remedies to the extent that the PHRA claims are not resolved before the PHRC.

137.    Jurisdiction of this action will be based on the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

138.    Plaintiff's filings with the EEOC constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

139.    Accordingly, Plaintiff will move to amend the complaint to affirmatively assert PHRA claims upon the exhaustion of administrative remedies.

**JURY TRIAL DEMANDED**

**BRACKEN LAW FIRM, LLC**

By _____
    Robert A. Bracken
    707 Grant Street
    Gulf Tower, Suite 1705
    Pittsburgh, PA 15219
    *Counsel for Plaintiff*

13